IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PENNIE PEHL BIEDIGER, | § | |
| INDIVIDUALLY AND ON BEHALF OF | § | |
| THE ESTATE OF ALFRED PEHL, JR. | § | |
| AND POLLY DIANE SAUERS | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO.: _____ |
| vs. | § | |
| | § | |
| CANE ISLAND HEALTHCARE, INC. | § | |
| D/B/A LEGEND OAKS HEALTH & | § | **DEMAND FOR JURY TRIAL** |
| REHABILITATION – KATY AND THE | § | |
| ENSIGN GROUP, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

NOW COME Pennie Biediger, Individually and on Behalf of the Estate of Alfred Pehl, Jr. and Polly Diane Sauers, Plaintiffs herein, and file their Original Complaint complaining of Defendants Cane Island Healthcare, Inc. d/b/a Legend Oaks Health & Rehabilitation – Katy and The Ensign Group, seeking damages for negligence that resulted in the death of Alfred Pehl, Jr., and would respectfully show unto the Court as follows:

## I.
## JURISDICTION AND VENUE

1.      This Court has diversity jurisdiction over this Civil Action under 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount-in-controversy exceeds $75,000.00.

2.      Venue for this controversy is proper in this Court because, under 28 U.S.C § 1391(b)(1), a civil action may be brought in any district in which a defendant resides, and under

28 U.S.C. § 1391(d), The Ensign Group, Inc. is deemed to reside in this district because Texas is

a state with more than one judicial district, because The Ensign Group, Inc. is subject to personal

jurisdiction in more than one judicial district, and because The Ensign Group, Inc. contacts in this

district are sufficient to subject it to personal jurisdiction.

## II.
## PARTIES

3.       Plaintiff, Pennie Pehl Biediger ("Ms. Biediger"), brings this wrongful death action

individually and as a statutory wrongful death beneficiary of Alfred Pehl, Jr. ("Mr. Pehl"), and, as

representative of the estate of Alfred Pehl, Jr., Plaintiff brings this survival action.  Plaintiff is a

citizen of the State of Texas.

4.       Plaintiff, Polly Diane Sauers ("Ms. Sauers"), brings this wrongful death action

individually and as a statutory wrongful death beneficiary of Mr. Pehl.  Plaintiff is a citizen of the

State of Texas.

5.       Defendant Cane Island Healthcare, Inc. ("Defendant Cane Island") is a foreign

corporation incorporated under the laws of Nevada with its principal place of business located at

21727 Provincial Boulevard, Katy, Texas 77450.    Defendant owned, operated, managed, and/or

controlled Legend Oaks Health & Rehabilitation - Katy during the time in which Mr. Pehl was a

resident therein.   This Defendant may be served with process through its registered agent, National

Registered Agents, Inc. at 1999 Bryan Street, Dallas, Texas 75201.

6.       Defendant The Ensign Group, Inc. ("Defendant Ensign") is a foreign for-profit

corporation with its principal place of business located at 27101 Puerta Real, Suite 450, Mission

Viejo, California, 92691.  Defendant conducts business in Texas by, among other acts, operating

nursing homes.  In particular, Defendant owned, operated, managed, and/or controlled Legend

Oaks Health & Rehabilitation - Katy during the time in which Mr. Pehl was a resident therein.

This Defendant may be served with process through its registered agent, National Registered Agents, Inc. at 1999 Bryan Street, Dallas, Texas 75201.

### III.
### ASSUMED NAME / MISNOMER

7.        In the event any parties are misnamed or not included herein, such event is a "misnomer."

8.        At all relevant times, Defendant Cane Island is believed to have done business as "Legend Oaks Health & Rehabilitation – Katy" (hereinafter "Legend Oaks") as an assumed business name.

9.        Plaintiffs brings this action against Defendant Cane Island in its assumed name and relies upon Fed. R. Civ. P. 17(b) in order to properly identify this defendant.

### IV.
### PRE-SUIT STATUTORY COMPLIANNCE

10.        Plaintiffs served pre-suit notices and authorizations more than sixty days before filing this lawsuit, as required by TEX. CIV. PRAC. & REM. CODE § 74.051.

11.        All conditions precedent to bringing this action have occurred or been performed.

### V.
### ALLEGATIONS REGARDING DEFENDANTS' JOINT VENTURE

12.        Plaintiffs allege that Defendant Cane Island and Defendant Ensign (collectively referred to herein as "Defendants") were engaged in a joint venture in the operation of Legend Oaks:

13.        Defendants joint venture in the operation of Legend Oaks included:

    a)        an agreement, express or implied, among the members of the group;

    b)        a common purpose to be carried out by the group;

    c)        a community of pecuniary interest in that purpose, among the members; and

d)      an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*See Morris v. Cessna Aircraft Co.,* 833 F.Supp.2d 622, 644 (N.D. Tex. 2011) (citing *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 530 (Tex.2002) quoting *Shoemaker v. Whistler's Estate,* 513 S.W.2d 10, 16-17 (Tex.1974) (quoting Restatement (Second) of Torts § 491 cmt. c (1965))).

14.     "Joint venture liability serves to make each party to the venture an agent of the other venturers and hold each venturer responsible for the wrongful acts of the others in pursuance of the venture." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017)

15.     Because of the joint venture, Defendants owed a joint duty to Mr. Pehl to provide the same level of care and treatment as any other reasonable, prudent, similar business that owns, operates, manages, and/or controls a nursing facility would have provided under the same or similar circumstances taking into consideration Mr. Pehl's known mental and physical condition.

## VI.
## DEFENDANTS UNDERSTAFFED LEGEND OAKS

16.     Because of their joint venture, Defendants had a joint obligation to sufficiently staff Legend Oaks to ensure that each of their residents received the necessary care and services in order for them to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care.

17.     This joint obligation required Defendants to base the number of Registered Nurses (RNs), Licensed Vocational Nurses (LVNs), and Certified Nurse Aides (CNAs) to be provided at Legend Oaks not only upon the number of residents residing in their facility (commonly referred to as "resident census") but also on the intensity of nursing care required by their residents.

18.     The term used by caregivers and health science literature to describe the intensity of nursing care required by a resident is "acuity level."

19.     Acuity levels are reflected in the resident's "Resource Utilization Group" classification or "RUGs."   RUGs are mutually exclusive categories that reflect the amount of resources that will be needed in order to meet the needs of a particular resident in a nursing facility. They are assigned to residents based on data derived from an assessment tool referred to as a "Minimum Data Set" (hereinafter "MDS").

20.     An MDS is prepared for each resident of a nursing facility regardless of who is paying for their stay in the nursing facility.  MDSs are required to be prepared when a resident initially arrives at the facility and periodically thereafter depending on the course of the resident's medical progression.  At a minimum, an MDS is to be prepared for every resident in a nursing facility on a quarterly basis.

21.     The completion of an MDS by a nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities.  MDSs need to be as detailed and comprehensive as possible so that they reflect all of the needs of each of the residents in the nursing facility.  When done properly, it provides a comprehensive assessment of each resident's functional capabilities and helps the staff of a nursing facility identify all of the health problems of each of their residents.

22.     The information contained in an MDS is used to slot the resident into a RUG. RUGs are organized in a hierarchy from residents who will need the greatest amount of resources to residents who will need the least amount of resources during their stay at the nursing facility. Residents who will need the greatest amount of resources are assigned to higher groups in the RUG hierarchy.

23.     RUGs also determine the level of compensation a nursing facility will receive in order to provide the level of care necessary for each of their residents.  Residents in higher RUGs place higher demands for care and services on the nursing facility and its staff.  Providing care to residents in higher RUGs is more costly and is, therefore, reimbursed at a higher level.

24.     The RUG assigned to a resident can be found in section Z of each resident's MDS.

25.     The only way to determine the total acuity level and corresponding RUG of each of the residents at Legend Oaks on any given day is by examining section Z of *every* MDS in effect on that day.

26.     The Centers for Medicare and Medicaid Services (hereinafter "CMS") is the federal agency that is tasked with regulating all nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that RNs, LVNs, and CNAs in nursing facility spend providing direct care to residents as well as other elements of resident care.

27.     Because of these studies, CMS is able to set a number of hours of direct care that they expect to be provided to residents by RNs, LVNs, and CNAs based on the nursing facility's total acuity level.  This expectation is expressed in terms of "hours per patient day" or "HPPD."

28.     Using the information contained in the MDSs of every resident in a nursing facility, CMS is able to determine an HPPD that is expected for each nursing facility in the country.  This is referred to as the "expected HPPD".  They are also able to adjust the HPPD per facility on a quarterly basis based on the updated MDSs that are provided to them.

29.     Nursing facilities, like Legend Oaks, are required to submit an annual "Cost Report" to CMS known as "CMS Form 2540-10."  The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

30.     Included in the costs are extensive details as to how much money the nursing facility spent on RNs, LVNs, and CNAs during that year.  The cost report also reports the resident census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers during that year.  By dividing the paid hours by the resident census, it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident, per day for the time period covered by that particular cost report.  This number is referred to as the "reported HPPD."

31.     The reported HPPD is actually an inflated number due to the fact that hours paid includes sick pay and vacation pay.  By removing the sick pay and vacation pay from the hours paid the resulting HPPD would be closer to the actual HPPD provided by caregivers to residents in nursing facilities.

32.     The actual HPPD for any given nursing facility can be determined by examining the data that nursing facilities use to track the number of hours their employees work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports," "Punch Detail Data Reports," or some other similarly named report depending on the time-keeping system used by the particular nursing facility.  This information can reveal the actual HPPD for any period of time including a year, a quarter, a month, or even a day.

33.     According to CMS expectations, during the last three quarters of 2016 Defendants failed to provide the level of staffing necessary to meet the needs of their residents including Mr. Pehl.  The following chart reflects the difference between CMS' expected level of staffing and the reported level of staffing provided by Defendants expressed in HPPD:

| 2016 RN, LVN & CNA Time | | | |
|---|---|---|---|
| Quarter | Reported Time | Expected Time | Difference | % Below/Above Expected |
| Second | 3.802877 | 4.33724 | -0.534363 | **-12.3%** |
| Third | 3.802877 | 4.33724 | -0.534363 | **-12.3%** |
| Fourth | 3.802877 | 4.33724 | -0.534363 | **-12.3%** |

34.     This chart shows that the staffing at Legend Oaks was 12.3% below what CMS expected based on the acuity of the residents who resided therein during the last three quarters of 2016.  If sick time and vacation time were removed from the "hours paid" in each of these categories of caregivers, the actual level of understaffing would turn out to be greater than these numbers indicate.  Additionally, whenever more accurate staffing information is made available to Plaintiffs, by way of employee time cards, the percentage of understaffing will likely increase significantly.

35.     Based on the CMS cost reports, Legend Oaks' understaffing allowed them to realize a savings of $585,977.60 during the last three quarters of 2016.  However, just like in the immediately preceding paragraph, whenever more accurate staffing information is made available to Plaintiffs, by way of employee time cards, these savings will likely increase significantly.

36.     Plaintiffs allege that Defendants jointly exercised control over the operation and management of Legend Oaks prior to and during Mr. Pehl's period of residency therein, including but not limited to, the creation, setting, funding and/or implementation of budgets; the monitoring of resident acuity levels; the monitoring of staffing levels; control over resident admissions and discharges; and control over the number of hours of direct care provided to the residents by RNs, LVNs, and CNAs.

37.     Plaintiffs allege that each of these managerial and operational functions had a direct impact on the amount and quality of care delivered to Mr. Pehl while he resided at Legend Oaks and were taken in furtherance of operational and managerial objectives.

38.     Plaintiffs allege that Defendants engaged in a systematic process of ensuring Legend Oaks maintained the highest acuity levels possible while failing to provide sufficient and qualified staff to meet the individual needs of their residents during Mr. Pehl's period of residency therein.

39.     Plaintiffs allege that this understaffing, although quite profitable for Defendants, directly resulted in their failure to provide the necessary and basic services Mr. Pehl needed in order to prevent him from developing pressure injuries.

**VII.**
**LEGEND OAKS NEGLECT OF MR. PEHL**

40.     At the time of his death, Mr. Pehl was a resident of Harris County, Texas.  Mr. Pehl was originally admitted to Legend Oaks on January 6, 2016. He had a medical history significant for Alzheimer's disease with behavioral disturbances. A history and physical created by Tanisha Mangon, Nurse Practitioner on January 7, 2016, stated that Mr. Pehl had been admitted from Memorial Hermann Katy after a hospitalization for a fall related to bradycardia.

41.     On June 11, 2016, a care plan was initiated due to Mr. Pehl's bowel and bladder incontinence and risk for skin breakdown. It called for checking the resident every two hours and assisting with toileting as needed. There is no documentation in Mr. Pehl's clinical record that either of these precautions were carried out.

42.     On November 29, 2016, a nursing note states that Mr. Pehl had developed a new pressure ulcer on his right buttock, listed as "unstageable". Orders were written at the time and stated that this wound is to be treated with Santyl ointment, a chemical debridement agent. A subsequent note documented on December 4, 2016 states that "resident continues to be turned over ever [sic] 2 hours to aid in wound healing by relieving pressure from buttocks". However, bed turning is not documented in any subsequent wound notes. Notes before November 29, 2016, but

during the month of November 2016 do not document his skin condition.

43.    On December 14, 2016, nursing notes state that he developed vomiting and diarrhea. Nurses called the Nurse Practitioner, and she advised that the patient should take more oral fluids. Nine (9) hours later, an IV was started with fluids running at 60 cc/hour.

44.    On December 19, 2016, the Nurse Practitioner ordered labs, which showed an elevated white blood cell count. Urine cultures are pending. The Nurse Practitioner ordered that ceftriaxone, an antibiotic, was to be given intravenously.

45.    By December 22, 2016, the urine culture results come back positive with multi-resistant bacteria that are not sensitive to ceftriaxone. Mr. Pehl was then immediately sent to Memorial Hermann Katy Hospital.

46.    Mr. Pehl returned to Legend Oaks on December 30, 2016 with hospice care. He died on January 9, 2017.

## VIII.
## AGENCY/ VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

47.    Plaintiffs hereby incorporate and reallege the matters set forth supra as if set forth at length in this section.

48.    Plaintiffs allege that the acts described herein were performed by the agents, representatives, servants, and/or employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, and/or employees during the course and scope of their agency, representation, employment, and/or official duties with Defendants within this joint venture.

49.    At all times material hereto, all agents, servants, and/or employees of Defendants were acting in furtherance of the duties of their agency, representation, employment, and/or official duties within this joint venture.

50.     Furthermore, Plaintiffs allege that the acts described herein as being performed by the agents, representatives, servants, and/or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Mr. Pehl.

51.     Therefore, Defendants are responsible and vicariously liable for all damages resulting from the negligent acts and/or omissions of their agents, representatives, servants, and/or employees pursuant to the doctrine of *Respondeat Superior*.

## IX.
## CAUSES OF ACTION

### COUNT I – CORPORATE NEGLIGENCE

52.     Plaintiffs hereby incorporate and reallege the matters set forth supra as if set forth at length in this section.

53.     At all relevant times and because of this joint venture, Defendants had a joint duty to act in accordance with the standards of care required of those owning, operating, managing, and/or controlling a nursing facility.

54.     With regard to these duties, Defendants had a direct joint corporate responsibility to Mr. Pehl to provide the same level of care and treatment as a reasonable, prudent, similar business that owns, operates, manages, and/or controls a nursing facility would have provided under the same or similar circumstances taking into consideration Mr. Pehl's known mental and physical condition.

55.     These joint duties required Defendants to have sufficient and qualified staff at Legend Oaks to ensure the proper care for and treatment of all residents including Mr. Pehl.

56.     Plaintiffs allege that Defendants breached their joint duty of care to Mr. Pehl by engaging in numerous improper acts and omissions constituting negligence, including but not limited to failing to properly staff Legend Oaks and thereby failing to provide the level of care that

Mr. Pehl's known mental and physical condition required.

57.     As a direct and proximate result of Defendants' understaffing of Legend Oaks during the last three quarters of 2016, Mr. Pehl, Biediger and Ms. Sauers suffered damages.

**X.**
**COUNT II – MEDICAL NEGLIGENCE AS TO DEFENDANTS**

58.     Plaintiffs hereby incorporate and reallege the matters set forth supra as if set forth at length in this section.

59.     At all times relevant hereto, Defendant Cane Island was a healthcare provider licensed by the State of Texas to provide healthcare services to residents such as Mr. Pehl.

60.     At all times relevant hereto, Defendants provided healthcare services to Mr. Pehl.

61.     At all times relevant hereto, Mr. Pehl was in a defenseless and dependent condition.

62.     Because of his defenseless and dependent condition, Mr. Pehl relied upon Defendants to provide for his safety, protection, care, and treatment.

63.     The standard of care for Defendants in providing care to Mr. Pehl required it to provide that level of care and treatment that a reasonable, prudent, similar nursing facilities would have provided under the same or similar circumstances taking into consideration Mr. Pehl's known mental and physical condition.

64.     The above referenced standard of care required Defendants to use reasonable care in:

    a)     Providing enough healthcare providers in order to provide the level of care necessary to meet the needs of Mr. Pehl;

    b)     Providing healthcare providers that were competent, supervised, and trained in order to meet the needs of Mr. Pehl;

    c)     Formulating and enforcing the policies and procedures, rules, and/or bylaws by which its personnel were to be governed so that they met the needs of Mr. Pehl;

> d)   Providing Mr. Pehl with a comprehensive assessment;
>
> e)   Providing Mr. Pehl with a comprehensive care plan;
>
> f)   Making sure that Mr. Pehl's comprehensive care plan was implemented;
>
> g)   Monitoring Mr. Pehl to assure that his comprehensive care plan actually met his needs;
>
> h)   Intervening when it became apparent that Mr. Pehl's comprehensive care plan no longer met his needs;
>
> i)   Adjusting Mr. Pehl's comprehensive care plan in order to ensure that it met his changing needs;
>
> j)   Making sure that Mr. Pehl's adjusted comprehensive care plan was implemented;
>
> k)   Monitoring Mr. Pehl to assure that his adjusted comprehensive care plan actually met his changing needs; and
>
> l)   Intervening when it became apparent that Mr. Pehl's adjusted comprehensive care plan no longer met his changing needs.

65.   These duties were non-delegable.

66.   Defendants breached its duty of care to Mr. Pehl by engaging in numerous improper acts and omissions constituting negligence, including but not limited to, failing to:

> a)   Provide enough doctors, nurses, and other healthcare providers in order to provide the level of care necessary to meet the needs of Mr. Pehl;
>
> b)   Provide doctors, nurses, and other healthcare providers that were competent, supervised, and trained in order to meet the needs of Mr. Pehl;
>
> c)   Formulate and enforce the policies and procedures, rules, and/or bylaws by which Defendants' medical and nonmedical personnel were to be governed so that they met the needs of Mr. Pehl;
>
> d)   Provide Mr. Pehl with a comprehensive assessment;
>
> e)   Provide Mr. Pehl with a comprehensive care plan;
>
> f)   Make sure that Mr. Pehl's comprehensive care plan was implemented;

g)   Monitor Mr. Pehl to assure that his comprehensive care plan actually met his needs;

h)   Intervene when it became apparent that Mr. Pehl's comprehensive care plan no longer met his needs;

i)   Adjust Mr. Pehl's comprehensive care plan in order to ensure that it met his changing needs;

j)   Make sure that Mr. Pehl's adjusted comprehensive care plan was implemented;

k)   Monitor Mr. Pehl to assure that his adjusted comprehensive care plan actually met his changing needs; and

l)   Intervene when it became apparent that Mr. Pehl's adjusted comprehensive care plan no longer met his changing needs.

67.   As a direct and proximate result of these numerous improper acts and omissions by Defendants, Mr. Pehl, Ms. Biediger and Ms. Sauers suffered damages.

**XI.**
**COUNT III – NEGLIGENCE PER SE**

68.   The Omnibus Budget Reconciliation Act, Pub. L. 100-203, 101 Stat. 1330 (1987), (hereinafter "OBRA") is a federal statute that regulates nursing facilities and which was in effect at the time Defendants were supposed to be providing care to Mr. Pehl when he resided at Legend Oaks.

69.   Federal courts have recognized that the Omnibus Budget Reconciliation Act, Pub. L. 100-203, 101 Stat. 1330 (1987), (hereinafter "OBRA") is a federal statute on which claims of negligence per se can be based. *McCain v. Beverly Health & Rehab. Servs.*, No. CIV.A. 02-657, 2002 WL 1565526, at *1 (E.D. Pa. July 15, 2002); *George v. N. Health Facilities, Inc.*, No. CIV.A. 11-2234, 2011 WL 2923885, at *3–4 (E.D. Pa. July 20, 2011).

70.     While providing care and treatment to Mr. Pehl, Defendants through their agents, representatives, servants, and/or employees breached its duty to Mr. Pehl and was guilty of acts of negligence *per se* in violating 42 C.F.R. §483.25(c) which is a section of OBRA.  This section of OBRA states:

> Based on the comprehensive assessment of a resident, the facility must ensure that—
>
> > (1)     A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and
> >
> > (2)     A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

71.     According to the *Medicare State Operations Manual*, a pressure sore is "avoidable" when "the resident developed a pressure ulcer/injury and that the facility did not do one or more of the following:

> a)     evaluate the resident's clinical condition and risk factors;
>
> b)     define and implement interventions that are consistent with resident needs, resident goals, and professional standards of practice;
>
> c)     monitor and evaluate the impact of the interventions; or
>
> d)     revise the interventions as appropriate.

72.     According to that same *Medicare State Operations Manual*, a pressure sore is "unavoidable" when "the resident developed a pressure ulcer/injury even though the facility had:

> a)     evaluated the resident's clinical condition and risk factors;
>
> b)     defined and implemented interventions that are consistent with resident needs, goals, and professional standards of practice;
>
> c)     monitored and evaluated the impact of the interventions; and

d)      revised the approaches as appropriate."

73.     Defendants failed to meet the standards required by 42 C.F.R. §483.25(c) and that expected by the *Medicare State Operations Manual* when they failed to

a)      evaluate Mr. Pehl's clinical condition and risk factors;

b)      define and implement interventions that are consistent with Mr. Pehl's needs, resident goals, and professional standards of practice;

c)      monitor and evaluate the impact of the interventions; or

d)      revise the interventions as appropriate.

74.     Defendants' acts or omissions failed to prevent Mr. Pehl from developing pressure sores and his clinical condition did not demonstrate that they were avoidable.

75.     Defendants' acts or omissions failed to promote healing, prevent infection, and prevent new pressure injuries from developing on Mr. Pehl.

76.     Defendants' acts or omissions violated 42 C.F.R. §483.25(c).

77.     Mr. Pehl was a member of the class of persons which 42 C.F.R. §483.25(c) was designed to protect.

78.     Defendants' act or omission proximately caused the injuries suffered by Mr. Pehl.

79.     As a direct and proximate result of these improper acts and omissions by Defendants, Mr. Pehl, Ms. Biediger and Ms. Sauers suffered damages.

## XII.
## COUNT IV:  GROSS NEGLIGENCE

80.     Plaintiffs hereby incorporate and reallege the matters set forth supra as if set forth at length in this section.

81.     Plaintiffs further plead that Defendants' acts and omissions constitute gross negligence. The acts or omissions, when viewed objectively from Defendants' standpoint at the

time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Defendants had actual, subjective awareness of the risk.

82.     The above acts and omissions involved an extreme degree of risk, and Defendants had actual and subjective awareness of this extreme degree of risk. These acts of gross negligence approximately caused Plaintiffs' injuries and damages.

83.     In addition to the foregoing, and pleading in the alternative, Defendants' conduct was with malice, as that term was defined at common law; Defendants acted with reckless disregard for the rights of others, thus injuring Mr. Pehl and Plaintiffs. *See Shannon v. Jones*, 76 Tex. 141, 13 S.W. 477, 478 (1890) (defining malice as a reckless disregard for the rights of others).

84.     In addition, and pleading in the alternative, if Texas Civil Practice and Remedies Code § 41.001(7) is deemed to require proof that Defendants had actual, subjective intent to harm Barry on the occasion in question before liability attaches, then the Legislature's act of deleting § 41.001(7)(B) of the definition of "malice" (that allowed proof of gross negligence) violates the "Open Courts" provision of the Texas Constitution by eliminating a common law right arbitrarily in light of the purposes of the statute leaving only an impossible condition before liability will attach. *See* TEX. CONST. ART. I § 13. In the past, § 41.001(7) passed constitutional muster because section (B) was included. *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 506 (Tex. 1997) ("Considering the Legislature's pronouncement that "malice" need not be directed toward a specific individual in the context of exemplary damages, it does not follow that in the context of peer review, the committee must necessarily act with malice toward a specific patient for that patient to prove his or her case). With the elimination of section (B) in 2003, the statute now violates the Texas Constitution if it requires an actual subjective intent to harm or injure the specific patient involved before liability attaches.

85.     In addition to the foregoing, and pleading in the alternative, the conduct of Defendants was with malice, as that term is defined in Texas Civil Practice and Remedies Code § 41.001.

86.     As a direct and proximate result of these improper acts and omissions by Defendants, Mr. Pehl, Ms. Biediger and Ms. Sauers suffered damages.

## XIII.
## DAMAGES

87.     Plaintiffs hereby incorporate and reallege the matters set forth supra as if set forth at length in this section

88.     Plaintiffs request that the jury consider what sum of money, if paid now in cash, would fairly and reasonably compensate them and the estate of Mr. Pehl for the injuries and damages they sustained in this case because of the negligence of Defendants.

89.     As a direct and proximate result of the previously discussed negligent conduct of Defendants, Mr. Pehl suffered in each of the following ways and Ms. Biediger, as representative of Mr. Pehl's estate, seeks compensation for each of the following:

a)      medical expenses;
b)      physical pain and suffering;
c)      disfigurement;
d)      physical impairment;
e)      mental pain and suffering;
f)      emotional pain and suffering;
g)      inconvenience; and
h)      loss of enjoyment of life.

90.     As a direct and proximate result of the previously discussed negligent conduct of Defendants, Ms. Biediger and Ms. Sauers suffered in each of the following ways for which they seek compensation:

a)      past and future mental pain and suffering;
b)      past and future emotional pain and suffering;

      c)     past and future loss of enjoyment of life;
      d)     loss of consortium; and
      e)     loss of companionship and society.

91.    Plaintiffs reserve the right to plead additional and more specific damages in the future as more facts become known.

## XIV.
## EXEMPLARY DAMAGES

92.    Plaintiffs hereby incorporate and reallege the matters set forth supra as if set forth at length in this section.

93.    The actions of Defendants constituted acts or omissions which when viewed objectively from Defendants' standpoint at the time of their occurrence or nonoccurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and of which Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of Mr. Pehl, such that, in addition to the damages set forth supra, Defendants are liable for exemplary damages for their grossly negligent care of Mr. Pehl.

94.    At the time Defendants caused and allowed Mr. Pehl's pressure injuries to develop and worsen, they knew that their conscious disregard to adequately staff Legend Oaks during the last three quarters of 2016 created a high degree of probability of this exact type of injury to residents, and consciously disregarded the safety of all residents including Mr. Pehl.

95.    Accordingly, Defendants' gross negligence requires that exemplary damages need to be assessed against them in an amount that is fair and reasonable and will punish Defendants and deter them, and others, from similar conduct.

## XV.
## DAMAGES CONSIDERED SEPARATELY

96.     Plaintiffs respectfully assert their request that they be allowed to have the elements of damages considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate them and the estate of Mr. Pehl for injuries, losses, and damages that they incurred and that they will incur, and that each element of the damages pled by Plaintiffs in this case be considered separately and individually, separating the past and future losses, so that pre-judgment interest due Plaintiffs may be computed.

## XVI.
## INTEREST AND COSTS

97.     Plaintiffs seek the recovery of pre-judgment interest and post-judgment interest as authorized by law.

98.     Plaintiffs also seek recovery for all costs of court.

## XVII.
## DEMAND FOR JURY TRIAL AND REQUEST FOR COURT REPORTER

99.     Plaintiffs demand a trial by jury to resolve all fact issues of whatever nature in this case and tender the appropriate fee.

100.    Plaintiffs respectfully request that a court reporter attend all sessions of court in connection with this case, and that the court reporter take full notes of all hearings, presentations of counsel, the jury selection, all testimony offered, all objections, arguments, and rulings and remarks of the court.

## XVIII.
## PRESERVATION OF EVIDENCE

101.    Defendants are hereby put on notice to hold and to take steps necessary in order to preserve all evidence relevant to this case during the pendency of this litigation, including but not

limited to all documents, records, reports, occupancy reports, acuity level reports, staffing reports, x-ray films, films, photographs, emails, letters, text messages, video, audio, and any other form of communication or other evidence related to this case in any way.

102.   Any ongoing process of document destruction involving these relevant documents must cease immediately.

## **PRAYER**

103.   **WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that Defendants be cited to appear and caused to answer herein, and that upon a final trial of this cause, Plaintiffs and the estate of Mr. Pehl be granted a judgment and recovery of, from, and against Defendants, jointly and severally, for each of the following:

   a)   Economic and noneconomic damages as alleged herein and/or proven at trial;

   b)   Pre-judgment interest (from the date of injury through the date of judgment) at the maximum rated allowed by law;

   c)   Exemplary damages;

   d)   Post-judgment interest at the legal rate;

   e)   Cost of court; and

   f)   Any and all such other and further relief to which the Plaintiffs may be entitled whether at law or in equity.

Respectfully submitted,

/s/Tanja K. Martini
Tanja K. Martini
Attorney-in-Charge
Texas Bar No. 24032581
USDCSDTX Bar No. 31012
The Martini Law Firm, PC
2608 Hibernia St., Ste. 210
Dallas, TX 75204
214.753.4757 – T
888.248.1734 – F
Email: tanja@themartinilawfirm.com

and

J.T. Borah
Texas Bar No. 00795765
USDCSDTX Bar No. 2838152
The Carlson Law Firm, P.C.
135 West Slaughter Lane, Suite A
Austin, Texas 78748
512.804.7277 – T
512.443.6501 – F
Email: JTBorah@carlsonattorneys.com

Attorney for Plaintiffs